UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANDREW BRATHWAITE, *as Administrator of the Estate of Richard Blake, Deceased*,

  Plaintiff,

– against –

THE CITY OF NEW YORK, VICTOR BELIN, HAURLTZ DERISMA, and JOHN AND JANE DOES 1-10,

  Defendants.

---

Case No. 24-CV-3222

**COMPLAINT**

JURY TRIAL DEMANDED

SHANIES LAW OFFICE LLC

David B. Shanies
Deborah I. Francois
Eleanor C. Davis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiff Andrew Brathwaite,
as Administrator of the Estate of Richard Blake, Deceased*

Plaintiff Andrew Brathwaite, as the Administrator of the Estate of Richard Blake (the "Estate"), by his undersigned counsel, the Shanies Law Office LLC, as and for his complaint against the above-named Defendants, alleges as follows:

## INTRODUCTION

1.      Richard Blake was 45 years old when he died on Rikers Island on April 30, 2021, because jail officials deprived him of necessary medical care for a cardiac emergency.

2.      In 2022, after completing its investigation of Mr. Blake's death, the New York State Commission of Correction found "that there was a failure by NYC DOC officers to maintain active supervision in accordance with Minimum Standards."

3.      Mr. Blake was arrested in March 2021 and charged with a minor parole violation. He suffered from chronic hypertension, a fact well known to the New York City Department of Correction ("DOC"), an agency of Defendant the City of New York (the "City") that administers the Rikers Island jail complex, and the NYC Health + Hospitals/Correctional Health Services ("CHS"), a division of the City's NYC Health + Hospitals that provides health care in the City's jails.

4.      While Mr. Blake was incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, DOC and CHS personnel denied him adequate medical care, including, *inter alia*, by administering him ibuprofen and naproxen—medications well known to be contraindicated for patients with hypertension and heart disease.

5.      DOC and CHS personnel also failed to document the medical incidents Mr. Blake suffered on Rikers Island, and the medical care that he received, completely and accurately.

6.      As a result of DOC's and CHS's indifference to Mr. Blake's history of chronic hypertension, Mr. Blake's health declined while incarcerated on Rikers Island, and DOC and CHS placed Mr. Blake at risk of a serious health episode and/or death.  DOC's and CHS's failures left

Mr. Blake vulnerable to increased blood pressure and were a proximate cause of his death on April 30, 2021.

7.      Indeed, following CHS's administration to Mr. Blake of ibuprofen on April 16, 2021 and of naproxen on April 27, 2021, Mr. Blake began experiencing severe heartburn, headaches, dizziness, and light sensitivity in his eyes.

8.      Other incarcerated individuals witnessed Mr. Blake vomiting and complaining of a terrible headache.

9.      On April 28, 2021—two days before his death—Mr. Blake lost consciousness, fell, and hit his head.

10.     Mr. Blake awoke in his cell to find a correction officer staring down at him.

11.     Upon information and belief, DOC and CHS personnel failed to provide Mr. Blake with adequate medical care following this episode on April 28, 2021.

12.     Two days later, on the evening of April 30, 2021, Mr. Blake was lying on his bed when he experienced a cardiac emergency.

13.     DOC correction officers, including Defendants Victor Belin and Haurltz Derisma, failed to summon emergency services or provide emergency care.

14.     The officers made comments suggesting they thought Mr. Blake was on drugs.  One officer even remarked that it was "too late" to call the captain.

15.     The officers failed to promptly render cardiopulmonary resuscitation ("CPR") or provide any other direct aid to Mr. Blake, failed to promptly summon medical assistance, failed to use their radios to signal the emergency, and exhibited a wanton disregard for Mr. Blake's safety and well-being.

16.     Alarmed by Defendants Belin's and Derisma's halfhearted response to Mr. Blake's dire condition, other incarcerated individuals in the housing unit pleaded with Officers Belin and Derisma to call for a medical emergency, tried to render aid directly to Mr. Blake, and even insisted on carrying Mr. Blake themselves to the medical unit.

17.     By the time medical staff finally arrived to Mr. Blake's housing unit, it was too late. Mr. Blake was unresponsive with no pulse, and he was pronounced dead that evening.

18.     Mr. Blake died on Rikers Island because the jail and its employees—including individual Defendants Belin, Derisma, and John and Jane Does 1-10 (collectively, "Individual Defendants")—were deliberately indifferent to his serious medical needs and failed to keep him safe, violating his constitutional rights under 42 U.S.C. § 1983.

19.     Tragically, Mr. Blake's death is not an isolated incident; it is instead part of an egregious pattern of incidents whereby Defendant the City and its officers and employees inadequately monitor or provide medical treatment to incarcerated individuals at Rikers Island, and fail to respond properly to medical emergencies.

20.     Mr. Blake's brother now brings this action to vindicate Mr. Blake's rights.

## JURISDICTION AND VENUE

21.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

22.     This Court has subject matter jurisdiction over Mr. Blake's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Blake's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution.

23.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant the City of New York resides in this judicial district and the acts complained of occurred in this judicial district.

## CONDITIONS PRECEDENT

24.     The Estate has complied with all conditions precedent to the commencement of this action, having timely served on or around July 16, 2021 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 90 days since said service, without these claims having been settled or otherwise resolved; and having brought this action in a timely manner.

25.     In response, counsel for the Comptroller issued a notice to take pre-lawsuit testimony from Mr. Blake under Section 50-h of the New York General Municipal Law.

## PARTIES

26.     Plaintiff Andrew Brathwaite is a citizen of the United Kingdom and a permanent resident of the United States.  He is the brother of Richard Blake, who died on April 30, 2021 while incarcerated at Rikers Island.  Mr. Brathwaite has been duly appointed by the Kings County Surrogate's Court as Administrator of the Estate of Richard Blake.

27.     Richard Blake, deceased, was a citizen of the United Kingdom and was, prior to his incarceration at Rikers Island, a resident of Kings County in the City and State of New York.

28.     Mr. Blake is survived by two sons, among other family members.

29.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.  The City, acting through DOC, operates a number of jails on Rikers Island, including OBCC.  DOC, in turn, is responsible for the care, custody, and supervision of individuals incarcerated at Rikers Island, including the jails in which Mr. Blake was

incarcerated between his arrest on or around March 12, 2021 and his death on April 30, 2021.  The City, acting through CHS, is responsible for the provision of medical care and services to incarcerated individuals in its custody.

30.     Defendant the City of New York is and was at all relevant times responsible for the policies, customs, and practices of DOC and CHS; the operation, maintenance, and control of DOC and CHS; and the selection, training, supervision, and discipline of DOC and CHS employees, including Individual Defendants referenced herein.

31.     DOC and CHS, through senior officials in their central offices and in each jail facility, including Rikers Island, promulgate and implement policies, including those regarding the provision of health care, and access to medical and other program services mandated by local law and court orders.

32.     Senior DOC and CHS officials were and are aware and tolerant of certain practices by subordinate personnel in the jails, including those that are inconsistent with formal policy.  Such practices at DOC facilities, and Rikers Island in particular, include the failure to provide adequate, appropriate, and timely medical care, monitoring, and assessment. Because these practices are widespread, longstanding, and deeply embedded in the culture of DOC and CHS, they constitute the legal equivalents of DOC and CHS policies and customs.

33.     At all relevant times, Defendant the City was responsible for safeguarding and providing medical care to Mr. Blake.  Instead, the City, via its policies, customs, and practices, was deliberately indifferent to his serious medical needs, placed him at risk of further illness and deterioration of his health, and failed to respond to his medical crisis on the day he died.

34.     Defendant Victor Belin was at all relevant times a municipal official employed by DOC and responsible for the care of those incarcerated at OBCC, including Mr. Blake.  At all

relevant times, Defendant Belin acted toward Mr. Blake under color of state law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the City and State of New York.  This lawsuit seeks to hold Defendant Belin liable in his individual capacity.

35.    Defendant Haurltz Derisma, also known as Haurltz Tatini Derisma, was at all relevant times a municipal official employed by DOC and responsible for the care of those incarcerated at OBCC, including Mr. Blake.  At all relevant times, Defendant Derisma acted toward Mr. Blake under color of state law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the City and State of New York.  This lawsuit seeks to hold Defendant Derisma liable in his individual capacity.

36.    Defendants John and Jane Does 1-5 are employees or agents of Defendant the City of New York who acted toward Mr. Blake under color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the City and State of New York; and who participated in, supervised, and/or had knowledge of and failed to intervene in the denial of prompt and adequate medical care required by Mr. Blake from the date of his admission to Rikers Island in March 2021 through April 29, 2021; but whose actual names the Estate has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John and Jane Does 1-5 liable in their individual capacities.

37.    Defendants John and Jane Does 6-10 are employees or agents of Defendant the City of New York who acted toward Mr. Blake under color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the City and State of New York; and who participated in, supervised, and/or had knowledge of and failed to intervene in the denial of prompt and adequate medical care required by Mr. Blake on April 30,

2021; but whose actual names the Estate has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John and Jane Does 6-10 liable in their individual capacities.

## JURY DEMAND

38.     Plaintiff hereby demands trial by jury of all issues raised in this complaint.

## FACTS

**A.     Richard Blake Arrives at Rikers Island**

39.     On or around March 12, 2021, Mr. Blake was arrested and charged with a minor parole violation.

40.     He was sent to Rikers Island, where he was housed first at the Eric M. Taylor Center and then at OBCC.

41.     Upon information and belief, Mr. Blake was housed at OBCC from at least as early as April 1, 2021.

42.     Upon information and belief, Mr. Blake was incarcerated in the custody, care, and control of DOC at Rikers Island for 49 days until his death in custody on April 30, 2021.

43.     At the time of his arrest and initial confinement by DOC, Mr. Blake was 45 years old.  He had suffered from chronic hypertension for decades and was taking medication to manage the condition.

44.     DOC and CHS were well aware of Mr. Blake's decades-long history of chronic hypertension.

45.     At intake to Rikers Island on March 12, 2021, Mr. Blake reported that he suffered from hypertension.

46.     He also reported that he was currently taking the medications Norvasc (a brand name for amlodipine) and lorsartan.

47.     Norvasc is used to treat high blood pressure, chest pain, and heart pain.

48.     Lorsartan is used to treat high blood pressure.

49.     Additionally, following a physical examination of Mr. Blake, under "Cardiovascular Notes," CHS personnel wrote, "Hypertensive Neurological."

50.     CHS personnel diagnosed Mr. Blake as having hypertension and documented in his records, "Medical Order - Chronic Care Follow-up."

51.     During the course of his incarceration, Mr. Blake was prescribed and administered amlodipine and lorsartan.

**B.     Richard Blake Experiences Severe Pain and Loses Consciousness Days Before His Death**

52.     On April 16, 2021, CHS personnel performed oral surgery on Mr. Blake and extracted a tooth.

53.     Following the extraction, CHS personnel administered ibuprofen to Mr. Blake.

54.     Ibuprofen is a nonsteroidal anti-inflammatory drug ("NSAID") that is known to carry heart risks, including raised blood pressure and heart attacks.

55.     Studies have shown that NSAIDs can aggravate pre-existing hypertension and interact negatively with hypertension medication, leading to serious adverse effects, including death.

56.     As such, individuals with high blood pressure that is difficult to manage are advised against taking NSAIDs.[1]

57.     On April 16, 2021, when CHS administered ibuprofen to Mr. Blake, CHS knew that he suffered from chronic hypertension.

---

1.   Cleveland   Clinic,   *NSAIDs   (Nonsteroidal   Anti-Inflammatory   Drugs)*   (July   24,   2023), https://my.clevelandclinic.org/health/treatments/11086-non-steroidal-anti-inflammatory-medicines-nsaids.

58.     On April 16, 2021, when CHS administered ibuprofen to Mr. Blake, CHS also administered to Mr. Blake his hypertension medications, including amlodipine and lorsartan.

59.     Over a week after his tooth extraction, Mr. Blake continued experiencing pain in the area where his tooth had been removed.

60.     He was seen at the medical clinic on the morning of April 27, 2021.  He reported to medical staff that he was taking ibuprofen, as he had been prescribed, and complained that he was still experiencing pain from the tooth extraction.

61.     Following this visit, CHS personnel determined that Mr. Blake required "heat sensitive housing."  There is no indication in the records that this happened.

62.     The medical records following the visit note that "[c]ommon clinical conditions requiring heat sensitive designation are . . . heart conditions," and include hypertension under Mr. Blake's "active problem list."

63.     Mr. Blake was seen at the medical clinic again on April 27, 2021.  He complained that the ibuprofen he had been prescribed was giving him heartburn, and also requested pain medication for his toothache.

64.     CHS personnel prescribed him Maalox for the heartburn and naproxen for the toothache.

65.     Naproxen is another type of NSAID that carries the same risks as ibuprofen.

66.     On April 27, 2021, when CHS administered naproxen to Mr. Blake, CHS knew that he suffered from chronic hypertension.

67.     On April 27, 2021, when CHS administered naproxen to Mr. Blake, CHS also administered to Mr. Blake his hypertension medications, including amlodipine and lorsartan.

68.     On April 28, 2021, Mr. Blake again went to the medical clinic, where he complained to CHS personnel that his heartburn had worsened after taking the naproxen that had been given to him.

69.     He further complained of vomiting and diarrhea.

70.     It was only at this time that CHS personnel advised Mr. Blake to "avoid use of nsaids."

71.     Medical records document that Mr. Blake "voiced full understanding and says that he will not take naproxen that was prescribed for him yesterday."

72.     Mr. Blake was returned to his housing unit.

73.     Upon information and belief, as the day progressed, Mr. Blake continued vomiting severely and experiencing significant heartburn, headaches, dizziness, and sensitivity to light.

74.     The pain became so severe that he lost consciousness, fell, and slammed his head.

75.     Mr. Blake awoke in his cell to find a correction officer staring down at him.

76.     Following this incident, Mr. Blake called his family, frantic about not feeling well. He reported to them about his persistent pain, heartburn, and loss of consciousness, and he told them that he was scared.

77.     Apart from giving him Maalox for his heartburn and diarrhea, and loperamide (the generic name for Imodium) also for his diarrhea, there is no record of Mr. Blake receiving any other medical care for the symptoms described above.

78.     Upon information and belief, Defendants John and Jane Does 1-5 were or should have been aware of Mr. Blake's chronic hypertension, failed to provide adequate medical care, participated in, supervised, and/or had knowledge of and failed to intervene in the denial of prompt and adequate medical care he required.

C.      **Richard Blake Suffers a Cardiac Emergency, Is Denied Prompt Medical Attention by Defendants, and Dies**

79.      On the evening of April 30, 2021, Mr. Blake retired into his cell and lay down on his bed.

80.      Upon information and belief, Mr. Blake's bed was located no more than 18 feet away from where the B Post Officer was stationed and was visible to the B Post Officer.

81.      At approximately 10:45 pm, "Individual 1,"[2] another person incarcerated at OBCC, was on his way to make himself a cup of hot chocolate when he looked over at Mr. Blake's cell and saw that Mr. Blake was in acute distress and visible need of medical attention.

82.      Individual 1 observed that Mr. Blake's eyes were bulging, and that Mr. Blake was breathing hard, grunting, writhing, and clutching his chest.

83.      Individual 1 rushed over to Mr. Blake's cell from the B Post where the hot water was located.

84.      Individual 1 turned Mr. Blake to Mr. Blake's side and shouted for correction staff to assist and to call for a medical emergency.

85.      Defendant Belin, who was posted just feet away, walked over to Mr. Blake's cell.

86.      Upon information and belief, Defendant Belin was a correction officer assigned to the B Post at OBCC and was on duty in Mr. Blake's housing unit on the evening of April 30, 2021.

87.      Defendant Belin saw and heard that Mr. Blake was distressed and in pain, and that he was in obvious need of emergency medical attention.

88.      Defendant Derisma walked over to Mr. Blake's cell shortly thereafter.

---

2.   Individual 1's identity is known to Plaintiff's counsel and being kept confidential in this Complaint to protect his privacy interests.   Relevant information will be disclosed to Defendants subject to the appropriate protective order.

89.     Upon information and belief, at all relevant times, Defendant Derisma was a correction officer assigned to the A Post at OBCC and was on duty in Mr. Blake's housing unit on the evening of April 30, 2021.

90.     Defendant Derisma saw and heard that Mr. Blake was distressed and in pain, and that he was in obvious need of emergency medical attention.

91.     Individual 1 repeatedly urged the officers to call for medical assistance.

92.     Defendant Belin refused, claiming that it was "too late to call the Captain or for a medical emergency" and that "we can handle" the problem.

93.     Other incarcerated individuals noticed Mr. Blake's distress and gathered at the scene.

94.     Defendants Belin and Derisma observed Individual 1 and the other incarcerated individuals respond to Mr. Blake's bedside and try to assist Mr. Blake.

95.     Individual 1 and other incarcerated individuals repeatedly pleaded with Defendants Belin and Derisma to call for assistance from the medical unit.

96.     Several of the incarcerated individuals sought to carry Mr. Blake to the medical unit themselves, but Defendants Belin and Derisma refused to let them.

97.     All the while, Defendants Belin and Derisma stood by and watched the scene.

98.     Far from "handling" the medical emergency, neither Belin nor Derisma took any step at this time to come to Mr. Blake's aid.

99.     As critical minutes ticked away, neither Belin nor Derisma contacted the medical unit to request medical attention for Mr. Blake, tried to perform CPR on Mr. Blake, nor rendered any other emergency aid to Mr. Blake.

100.    Prompt intervention is essential with cardiac emergencies like cardiac arrests and heart attacks and can prevent death.

101.    When Individual 1 realized that Mr. Blake was no longer breathing, he alerted Defendants Belin and Derisma.

102.    Only then did Defendant Derisma attempt to perform CPR on Mr. Blake.

103.    Neither Defendant Belin nor Defendant Derisma had in his possession a device provided to correction officers to press to alert of an emergency.

104.    This emergency alert device had been left in the "bubble," a glass-encased booth from where an officer sits and monitors the housing unit.

105.    Individual 1 reported hearing one of the named Individual Defendants ask the other to pass him the device, but the other Defendant said he could not because he was on camera.

106.    Had this emergency alert device been available and used immediately, Mr. Blake could have been received life-saving medical attention.

107.    These types of emergency alert devices are standard emergency equipment for jails and prisons.

108.    Having these types of emergency alert devices on hand, and training officers on their proper use, is the standard of care in jails and prisons and a readily available solution for the risk of cardiac emergencies like cardiac arrests and heart attacks.

109.    Defendant Derisma also refused to use his radio to report the medical emergency, even when Individual 1 implored him to do so.

110.    Upon information and belief, Mr. Blake's housing unit lacked an automated external defibrillator.

111.   When medical personnel did arrive, following a significant period of delay, numerous other DOC personnel—including Officer Bah, Captain Quinones, Captain Gilkes, and Captain Gorritz—also arrived at the scene.

112.   None of these individuals brought an oxygen tank with them.

113.   By this time, Mr. Blake had been moved to the floor.

114.   He had long stopped breathing and was unresponsive with no pulse.

115.   Upon information and belief, Urgicare and Emergency Medical Services ("EMS") were not notified until after medical staff's arrival to the scene.

116.   Individual 1 reported that Defendant(s) Belin and/or Derisma discussed with their superiors that they delayed their response because they thought Mr. Blake was on drugs.

117.   That was false.  Furthermore, even if Mr. Blake had taken drugs, DOC and CHS still were obligated to render prompt medical care.

118.   Upon medical staff's arrival to Mr. Blake's cell, the responding team took turns performing CPR on Mr. Blake until Urgicare and EMS arrived.

119.   At no point during this medical emergency did Defendant Belin attempt CPR on Mr. Blake or give any other first aid to Mr. Blake.

120.   Had Defendants Belin and Derisma acted swiftly and in accordance with counsel correctional practice, Mr. Blake might have survived.  But they did not.

121.   Upon information and belief, following this incident, a DOC captain warned Defendants Belin and Derisma that they "better go somewhere and get your story straight."

122.   Upon information and belief, Defendants John and Jane Does 6-10 were or should have been aware of Mr. Blake's chronic hypertension, failed to provide adequate medical care,

participated in, supervised, and/or had knowledge of and failed to intervene in the denial of prompt and adequate medical care he required.

123.    Mr. Blake was pronounced dead at 11:47 pm on April 30, 2021.

124.    Following an autopsy on May 1, 2021, the New York City Office of Chief Medical Examiner declared Mr. Blake's cause of death to be hypertensive and atherosclerotic cardiovascular disease.

**D.      The Commission of Correction Investigates Richard Blake's Death**

125.    The New York State Commission of Correction (the "SCOC") is the agency responsible for regulating, monitoring, and inspecting correctional facilities within the State of New York, including those on Rikers Island.

126.    The SCOC's stated mission is to "provide for a safe, stable and humane correctional system in New York State."

127.    The SCOC's Medical Review Board (the "MRB") is required by statute to investigate and prepare a report on the cause and circumstances of all in-custody deaths at facilities within the State.

128.    The SCOC's MRB investigated Mr. Blake's death.

129.    On September 27, 2022, the SCOC published its "Final Report of the New York State Commission of Correction: In the Matter of the Death of Richard Blake, an Incarcerated Individual of the Otis Bantum Correctional Center" (the "SCOC Report").

130.    As noted in the SCOC Report, as part of its investigation, SCOC staff interviewed DOC staff and reviewed video footage and DOC records.

131.    Among those interviewed was Defendant Belin.

132.    The SCOC concluded "that there was a failure by NYC DOC officers to maintain active supervision in accordance with Minimum Standards."

133.    Under "Actions Required," the SCOC Report noted that "[t]he Commissioner shall conduct an investigation into the actions of the DOC officers assigned to supervise the housing unit and who failed to follow the requirements of [the Minimum Standards]," and that "[a]dministrative action should be taken if the officers are found to be in violation of department directives."

134.    The SCOC further noted that in a response to the SCOC's preliminary report, "NYC DOC indicated that both issues have been referred to the NYC DOC Investigative Division for further investigation and follow up."

**E.    The City's Deliberate Indifference to the Well-Being of the Incarcerated People in Its Care Caused Richard Blake's Death**

135.    The facilities on Rikers Island have long been notorious for the persistent brutality and mistreatment of individuals incarcerated at those facilities.  Death rates, news articles, official investigations, and even a federal monitorship have made clear for years the need for drastic changes to conditions at the facilities.  Nonetheless, the City continues to house incarcerated people in blatantly unsafe conditions, exhibiting deliberate indifference to the inevitable harm caused by that choice—including an unusually high number of deaths like Mr. Blake's.

136.    Between 2010 and 2016, for example, there were more than 100 deaths in New York City jails.  Former Medical Director Homer Venters found that up to twenty percent of those deaths each year were "jail-attributable deaths."

137.    In February of 2018 the SCOC issued a report titled "The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State."[3]  In a section about Rikers Island, the SCOC wrote, "Rikers Island continues to be plagued by managerial failures, significant

---

3.    New York State Comm'n of Corr., *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* (Feb. 2018), available at https://scoc.ny.gov/system/files/documents/2023/09/problematic-jails-report-2-2018.pdf.

structural problems, regulatory compliance failures, identified deficiencies that remain unaddressed, and unabated harm to both staff and inmates alike.  The Commission has sought to assist Rikers management in addressing these and many other deficiencies, and facilitate improvements, but those efforts have not been successful . . . ."

138.    According to data gathered and maintained by DOC, DOC's in-custody mortality rate sharply increased during the years leading up to Mr. Blake's death in 2021.

139.    The City's own data shows that DOC's in-custody mortality rate was 0.65 in 2017, 0.96 in 2018, and 0.41 in 2019.

140.    There was a sharp increase in in-custody deaths in 2020, when the mortality rate increased to 2.42.  That number increased yet again in 2021 to 2.87—the highest in over a decade.

141.    According to an October 28, 2022 Special Report filed by the independent monitor appointed by this Court to oversee the City's compliance with its consent judgment in *Nunez v. City of New York*, 11-CV-5845 (LTS) (JCF) (SDNY), concerning conditions of confinement at Rikers (the "*Nunez* Independent Monitor"), DOC's "practice failures," including "poor security practices," "staff mismanagement," and "potential staff inaction" contributed to this increase in in-custody deaths.

142.    In 2021, at least sixteen incarcerated people died in DOC custody, including Mr. Blake.

###### 1.    *The City's Widespread and Persistent Practice of Insufficient Supervision by Jail Staff*

143.    According to formal DOC policy, correction officers are required to conduct rounds in jail housing units every 30 minutes.

144.    In violation of this policy, officers regularly fail to conduct rounds every 30 minutes and do not otherwise adequately supervise incarcerated people.

145.   The City's widespread practice of inadequate supervision of incarcerated individuals existed at DOC facilities for years leading up to Mr. Blake's death.

146.   This issue was exacerbated by staffing shortages that began to plague DOC facilities, including those on Rikers Island, during the COVID-19 pandemic.

147.   For example, the *Nunez* Independent Monitor observed "a spike in employee absenteeism that began in April 2021"—precisely when Mr. Blake died.  *See Nunez v. City of New York*, 11-CV-5845 (LTS) (JCF) (SDNY), ECF No. 378 (Letter to Court) at 3.  DOC's "level of absenteeism has always been relatively high, [but it] grew considerably during March 2020 . . . [and] reached a crisis level beginning in Spring 2021."  *Id.*

148.   This level of staff absenteeism meant "officers ha[d] to work double and triple shifts, further compromising the safety of [DOC] Facilities."  *Id.*  This persistent over-scheduling of staff, combined with a large number of staff prohibited from working directly with incarcerated people and a failure to efficiently and effectively assign staff, created a "state of seriously compromised safety" that "spiraled to a point at which, on a daily basis, there [wa]s a manifest risk of serious harm to both detainees and staff."  *Id.* at 3-4.

149.   The *Nunez* Independent Monitor also identified "long-standing, systemic issues that undercut the implementation of proper security protocols and the provision of basic services."  *Id.* at 4.  These included ongoing practices related to failures to adequately supervise incarcerated individuals, including "[c]hoosing a passive, stationary supervision style" by "rarely [being] mobile throughout housing units" and "[a]bandoning an assigned post without relief or permission."  *Id.* at 7.

150.   More recently, the *Nunez* Independent Monitor reported that it "is deeply concerned about the increases in death [in DOC facilities] since 2020, particularly those related to poor

security practices, operational failures, suicide, and overdose." *Nunez v. City of New York*, 11-CV-5845 (LTS) (JCF) (SDNY), ECF No. 561 (Special Report) at 14.

151.    A 2022 Board of Correction (the "BOC") report (the "BOC Report")[4] reviewed ten of the sixteen 2021 deaths in detail—those caused by suicide or drug use—and found that "[t]he pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed."  It continued to note that "proper supervision is especially lacking at night" and observed that, in four of the deaths reviewed, "correction officers did not tour consistently overnight and when they did conduct walk-throughs, they did not verify that people in custody under their supervision were alive and breathing."

152.    "Instances of false or insufficient logbook entries were identified in at least four of the deaths reviewed" as well.  In three of those cases, "[l]ogbook entries . . . indicated that tours were conducted regularly, however, areas were not toured for stretches of time exceeding DOC policy."

153.    The BOC Report also found that insufficient staffing was implicated in at least three of the studied deaths.

154.    Even when DOC staff is present, staff failed to adequately monitor or supervise housing areas and individuals in their custody.

155.    DOC's widespread and persistent practice of insufficient supervision has directly led to the needless and preventable deaths of numerous incarcerated individuals, including Mr. Blake.

---

4.    New York City Bd. of Corr., *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* (Sept. 12, 2022), available at https://s3.documentcloud.org/documents/22279243/final-2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf.

### 2.   The City's Widespread and Persistent Practice of Failing to Provide Adequate and Prompt Medical Care

156.   The City also regularly fails to provide adequate and prompt medical care to incarcerated people in its DOC facilities.

157.   Formal DOC policy mandates that "[i]n case of an emergency requiring CPR or first aid, uniform staff members have a responsibility to render such aid until the arrival of medical personnel."

158.   Formal DOC policy instructs DOC staff members trained in CPR and currently certified in CPR administration to administer CPR.

159.   Formal DOC policy states that DOC personnel who are not CPR certified shall limit their resuscitation efforts to rescue breathing.

160.   In practice, DOC staff, including correction officers, do not follow these formal policies when responding to incarcerated people's serious medical needs.

161.   Additionally, the City does not adequately train DOC officers in emergency response protocols even though it knows, to a certainty, that incarcerated people on Rikers Island will have medical emergencies to which staff will need to respond.

162.   At the time of Mr. Blake's death, the widespread and persistent practice among DOC staff, including correction officers, was to *not* provide CPR or first aid in response to incarcerated people's medical emergencies.

163.   Prior to Mr. Blake's death, the City had notice of DOC staff's widespread and persistent practice of failing to provide timely first aid or CPR, and of DOC staff's recurring inaction in the face of medical emergencies.

164.   Indeed, in the years and months leading up to Mr. Blake's death, several other incarcerated people died or were seriously injured due to the failure of DOC staff to provide

adequate urgent or emergency medical care.  The City was long aware of these failures but took no measures to improve its training or supervision of its employees regarding first aid or CPR, or to discipline those employees who did not follow its protocols for responding to emergency care, tacitly permitting such behavior and risking the lives of incarcerated individuals in its care.

165.    For example, on August 27, 2017, Wayne Henderson died on Rikers Island in DOC custody after being denied medical treatment for his seizures and sent to his cell.  DOC and CHS were aware of Mr. Henderson's history of seizures and need for close monitoring.  In a December 17, 2019 report on Mr. Henderson's death, the SCOC directed CHS to "commence a comprehensive review and revision of the medication delivery and reconciliation process for inmates within NYC DOC."  As evidenced by the many deaths on Rikers following Mr. Henderson's, CHS has failed adequately to do so.

166.    On January 4, 2018, Joseph Foster died after suffering a fatal brain hemorrhage five days earlier while in DOC custody on Rikers Island.  Upon information and belief, Mr. Foster had repeatedly requested medical care for a severe headache and numbness on the left side of his body.  DOC knew that his medical history included high blood pressure and the need for additional monitoring and supervision.  Upon information and belief, despite such knowledge, DOC staff delayed more than an hour in summoning medical assistance or moving Mr. Foster to a medical clinic.

167.    On June 7, 2019, Layleen Polanco died following a fatal epileptic seizure and head trauma while incarcerated on Rikers Island after DOC personnel failed to summon medical assistance for over an hour.  DOC and CHS were well aware that Ms. Polanco suffered from schizophrenia and epilepsy, both of which pose a heightened risk of death from seizure-related complications.

21

168.   On November 23, 2019, LeBarnes McClure died in DOC custody on Rikers Island at the age of 55 years old.  Following its investigation into Mr. McClure's death, the SCOC found that CHS medical providers "failed to adequately recognize and manage McClure's acute medical distress when he presented to emergency sick call on 11/22/2019," "failed to recognize McClure's presenting signs and symptoms, in a patient with multiple known risk factors," and "delayed in obtaining emergency transport of McClure to a hospital."  The SCOC's MRB also "opine[d] that had McClure received timely and competent medical care, McClure's death may have been preventable."

169.   On November 27, 2019, 18-year-old Nicholas Feliciano hanged himself in an intake pen on Rikers Island.  According to the BOC, he was hanging for almost eight minutes in plain view of DOC correction officers and other staff before he was cut down.  As a result of the prolonged oxygen deprivation he suffered during this incident, he has significant brain damage and cannot live independently.

170.   On June 21, 2020, Herminio Villanueva died of an asthma attack while incarcerated on Rikers Island.  That morning, Mr. Villanueva woke up struggling to breathe, but DOC correction officers failed to promptly summon medical assistance and failed to react when medical personnel did not respond to their initial call.  Other incarcerated people attempted to carry Mr. Villanueva out of the housing unit and to the medical clinic, but they were turned back by DOC medical staff.  By the time medical staff arrived, it was too late, and Mr. Villanueva was pronounced dead later that morning.   The SCOC's MRB "found that there was a failure of corrections staff to provide first aid and cardiopulmonary resuscitation to [Mr. Villanueva] which led to his death.  Additionally, the Medical Review Board found that there was inadequate monitoring and assessment of [Mr. Villanueva's] health during his incarceration."

171.    On March 3, 2021, correction officers found Tomas Carlo Camacho unresponsive in his cell at Rikers.  Contrary to DOC policy, no one had checked on Camacho for almost two hours.  Once they did notice that Mr. Camacho was unresponsive, correction officers did not render any first aid while awaiting the arrival of medical clinic staff.  When medical staff later arrived, Mr. Camacho still had a pulse.  He died at the hospital two weeks later.

172.    A failure to provide emergency medical care also contributed to the death of Thomas Braunson on April 19, 2021, just eleven days before Mr. Blake's death.  Mr. Braunson spent days under horrific conditions in the intake pens before dying from a drug overdose.  Video surveillance footage show that correction officers walked to and from Mr. Braunson's bed for ten minutes after realizing he was nonresponsive, during which time they "never performed chest compressions or CPR" and instead simply idled until medical staff arrived.

173.    In the BOC Report examining the 2021 in-custody deaths, the BOC expressly recommended that DOC "should reevaluate and strengthen its . . . CPR training for staff as several officers with such training failed to intervene in multiple instances" in 2021.

174.    The City's widespread and persistent practice of failing to render emergency medical care has continued after Mr. Blake's death in April 2021.

175.    For example, on June 30, 2021, just two months after Mr. Blake's death, Robert Jackson, like Mr. Blake, died while incarcerated on Rikers Island of "hypertensive and atherosclerotic cardiovascular disease."  Medical staff took approximately ninety minutes to respond to the situation, even after multiple emergency calls from DOC staff, a delayed response that the BOC Report highlighted as "a severe discrepancy" that "must be addressed."

176.    On December 14, 2021, the sole correction officer assigned to William Brown's Rikers housing unit stood by for at least nine minutes while Mr. Brown went into crisis and became

unresponsive, before the officer finally performed chest compressions on Mr. Brown. Minutes later, Mr. Brown died from a drug overdose.

177.    On August 30, 2021, two correction officers and a captain entered Segundo Guallpa's cell and discovered that he was unresponsive with a ligature made from socks wrapped around his neck and the bedframe.  The three officers stood by his bedside, talking and looking at Mr. Guallpa, instead of performing first aid.  Mr. Guallpa was pronounced dead nearly twenty minutes later.

178.    The deaths described above were all part of a longstanding and pervasive policy, custom, and practice of DOC and CHS of denying prompt and adequate medical care to incarcerated individuals, of which Defendant the City, through its officers and employees, was aware, permitted, tolerated, condoned, and was deliberately indifferent.

179.    Defendant the City's failure to provide timely and adequate medical responses to Mr. Blake was part of a pattern and practice of failing to promptly respond to medical emergencies and otherwise provide adequate medical care experienced by incarcerated people in DOC custody including on Rikers Island.

### FIRST CAUSE OF ACTION

#### 42 U.S.C. § 1983

*Deliberate Indifference*
*(U.S. Constitution Amendments VIII and XIV)*

#### Against All Individual Defendants

180.    The Estate repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

181.    By reason of the foregoing, and by denying Mr. Blake access to adequate medical care, failing to promptly summon medical treatment, and/or failing to provide prompt medical

treatment, Individual Defendants acted with deliberate indifference to Mr. Blake's serious medical needs, thereby depriving him of his rights, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

182.     Individual Defendants acted at all relevant times willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Blake that shocks the conscience.

183.     Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Blake of his constitutional rights secured by 42 U.S.C. § 1983 and by the Eighth and Fourteenth Amendments to the United States Constitution.

184.     As a direct and proximate result of these violations of Mr. Blake's constitutional rights, Mr. Blake suffered the damages alleged herein.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New York

185.     The Estate repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

186.     At the time of Mr. Blake's incarceration and death in DOC custody, Defendant the City permitted, tolerated, and was deliberately indifferent to a widespread and persistent policy, custom, and practice of medical neglect, deliberate indifference, and negligence by DOC and CHS agents and employees towards the serious medical needs of incarcerated people, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency.

187.    At the time of Mr. Blake's incarceration and death in DOC custody, Defendant the City also permitted, tolerated, and was deliberately indifferent to DOC's and CHS's widespread and persistent policy, custom, and practice of mismanaging staffing levels in DOC correctional facilities, which caused insufficient supervision of incarcerated individuals and rounding.  This widespread and persistent policy of insufficient staffing exacerbated the deadly effects of DOC's and CHS's policy, custom, and practice of medical neglect, deliberate indifference, and negligence by DOC and CHS agents and employees towards the serious medical needs of incarcerated people, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency.

188.    At the time of Mr. Blake's incarceration and death in DOC custody, Defendant the City also permitted, tolerated, and was deliberately indifferent to DOC's widespread and persistent policy, custom, and practice of DOC staff failing to adequately monitor or supervise housing areas or conduct sufficient rounds to monitor the safety and security of the incarcerated individuals in custody.  This widespread and persistent policy of inadequate supervision of housing areas and insufficient rounding exacerbated the deadly effects of DOC's and CHS's policy, custom, and practice of medical neglect, deliberate indifference, and negligence by DOC and CHS agents and employees towards the serious medical needs of incarcerated people, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency.

189.    Defendant the City exhibited deliberate indifference to the serious medical needs of incarcerated people, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency, by, among other things:

      a.    Failing to supervise DOC and CHS agents and employees who were responsible for treating or responding to the serious medical needs of incarcerated people,

including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency;

b. Failing to train DOC and CHS agents and employees to provide CPR and first aid to incarcerated people facing medical emergencies, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency;

c. Failing to train DOC and CHS agents and employees to provide appropriate and prompt medical care to incarcerated people with serious medical needs, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency; and

d. Failing to discipline DOC and CHS agents and employees who fail to provide appropriate and prompt medical care to incarcerated people with serious medical needs, including incarcerated people who have chronic hypertension and/or are experiencing a cardiac emergency.

190. The City was put on notice of the risk of inaction to correct these failures, as evidenced by the repeated deaths and injuries suffered by incarcerated people prior to Mr. Blake's death in 2021.

191. Nonetheless, the City took no action to prevent harm to incarcerated people in the future.

192. The City's permitting, tolerance of, and deliberate indifference towards DOC and CHS agents' and employees' medical neglect, deliberate indifference, and negligence towards the serious medical needs of incarcerated people constituted a municipal and corporate policy, custom, and practice.

193.    By permitting, tolerating, and acting with deliberate indifference towards DOC and CHS agents' and employees' medical neglect, deliberate indifference, and negligence towards the serious medical needs of incarcerated people, the City deprived Mr. Blake of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

194.    As a direct and proximate result of the misconduct and abuses of authority detailed above, Mr. Blake sustained the damages alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Andrew Brathwaite, as Administrator of the Estate of Richard Blake, demands judgment against the above-captioned Defendants as follows:

a.  for compensatory damages to be determined at trial, but in all events no less than $15 million;

b.  for punitive damages against each Individual Defendant in an amount to be determined at trial;

c.  for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  for pre- and post-judgment interest as allowed by law; and

e.  for such other relief as this Court deems just and proper.

Dated:  April 30, 2024
New York, New York

SHANIES LAW OFFICE LLC

By:  _____
David B. Shanies
Deborah I. Francois
Eleanor C. Davis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiff Andrew Brathwaite, as Administrator of the Estate of Richard Blake, Deceased*